IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 05 CR 506 |
| v. ) | |
| ) | |
| JOSE LUIS PENA and ) | |
| CESAR RIVERA-GONZALEZ, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

This case is before the Court on the motions of Defendant Cesar Rivera-Gonzalez to quash arrest and suppress evidence and statements, and the motions of Defendant Jose Luis Pena to suppress evidence. For the following reasons, the motions are denied.

### BACKGROUND

Defendants Jose Luis Pena and Cesar Rivera-Gonzalez are charged in a two-count indictment with conspiring to knowingly and intentionally distribute, and possess with intent to distribute, more than five kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1). This Court held a suppression hearing in this matter, which revealed the following facts.

On Thursday, May 26, 2005, a cooperating witness ("CW 1"), who had previously provided reliable information to the Drug Enforcement Administration ("DEA"), received a telephone call from an unknown Hispanic male on behalf of an individual referred to as "Individual A." During the unrecorded telephone call, CW 1 agreed to enter into a multi-kilogram cocaine transaction with the

unknown Hispanic male. It was agreed that the unknown Hispanic male would dispatch a representative to Chicago, Illinois to oversee and complete the drug transaction.

On Wednesday, June 1, 2005, CW1 participated in three recorded telephone calls with Individual A. During the telephone calls, Individual A indicated that a representative from the aforementioned drug trafficking organization would be arriving in Chicago, Illinois later that day to meet with CW 1. Individual A further indicated that upon his arrival, the representative would call CW1 to arrange the drug transaction. Later that day, at approximately 2:59 p.m., CW1 received a telephone call from a representative of the drug trafficking organization. This telephone call was recorded. During the telephone call, the representative (who was subsequently identified as Cesar Rivera-Gonzalez) indicated that he had arrived in Chicago and would be contacting CW I later that evening to complete the drug transaction. CW1 subsequently received a telephone call from Rivera-Gonzalez, but due to the time of the call, CW 1 and Rivera-Gonzalez agreed to complete the transaction the following day, June 2, 2005.

On Thursday, June 2, 2005, CW1 and a second DEA cooperating witness (hereinafter referred to as "CW2") met with Cesar Rivera-Gonzalez and a person referred to as Individual B at the Best Buy store at the North Riverside Mall. This meeting was monitored by audio and physical surveillance. During the meeting, Rivera-Gonzalez agreed to provide CW1 with kilograms of cocaine. The meeting concluded with the understanding that Rivera-Gonzalez would travel to Crystal Lake, Illinois to arrange the cocaine transaction. Surveillance then followed Rivera-Gonzalez and Individual B from the North Riverside Mall to a Menard's located at Route 31 and Route 14 in Crystal Lake.

2

While at the Menard's, investigators observed Rivera-Gonzalez exit a taxi and meet with an Hispanic male driving a red Chevy Blazer. The license plate on the red Chevy Blazer was registered to Jose Luis Pena of 32 Clover Drive in Crystal Lake, Illinois. Also included in the registration was a wanted alert for Jose Luis Pena from the New York City Police Department for "Dangerous Drugs." The Agents later found out that Defendant Jose Luis Pena was not the "Jose Luis Pena" referred to in the "Dangerous Drugs" warrant from New York City.

At the conclusion of the meeting, investigators watched Rivera-Gonzalez re-enter the taxi, while Pena departed in a different direction. Surveillance agents followed Rivera-Gonzalez and Individual B from Crystal Lake to the Patio Motel on 6250 N. Lincoln Avenue in Chicago. Other surveillance agents followed Pena from the Menard's to 32 Clover Drive in Crystal Lake.

At approximately 3:15 p.m., surveillance following Pena observed an Hispanic male exit the residence at 32 Clover Drive. Investigators watched the Hispanic male enter a white Jeep Cherokee and depart the area. Immediately following this, investigators conducted an investigative stop on the Jeep and identified the driver as Individual C. During the traffic stop, Individual C told investigators he was a resident of 32 Clover Drive. Additionally, Individual C told investigators that Pena was also inside the residence. Individual C subsequently provided investigators with written consent to search the residence.

Upon approaching the residence at 32 Clover Drive, investigators approached three Hispanic males on the street, one of whom was identified as Jose Luis Pena. Pena was then placed under arrest. Immediately thereafter, Pena also provided investigators with verbal consent to search 32 Clover Drive.

3

Once inside, the investigators searched the residence and had a canine unit go through the residence. The canine unit alerted in the back bedroom to a small dresser. One investigator, Agent Michael Zackavec of the South Holland Police Department, went over to the dresser and found a set of keys. He testified that they seemed out of place and brought them to Mr. Pena. In bringing the keys to Mr. Pena, Agent Zackavec was advised that Mr. Pena had been read his *Miranda* warning. Agent Zackavec asked Mr. Pena what the keys were for. Through an interpreter, Pena told Agent Zackavec that the keys belonged to a previous apartment where Pena used to live. Agent Zackavec testified that this seemed suspicious, and in going through Mr. Pena's wallet, he found a check stub that had an address different from the address of his residence. The agents went to that address, and the key did not work there. The investigators then conducted an AutoTrak search on Pena to determine if there were any other addresses associated with him. The AutoTrak search revealed that Pena was a listed owner of a business at 561 Jennings Drive 3 in Lake of the Hills, Illinois. Investigators then received written consent from Pena to conduct a search of the business located at 561 Jennings Drive 3.

At approximately 7:00 p.m., investigators secured the building located at 561 Jennings Drive 3 and, after searching the building, discovered two black plastic trash bags containing approximately 42 kilograms of suspect powder cocaine. Investigators performed a field test of the substances contained in the black plastic trash bags found in the business location. The field test was positive for the presence of cocaine.

After the discovery of the kilograms of cocaine at 561 Jennings Drive 3, investigators, who had been conducting surveillance, approached Rivera-Gonzalez and Individual B as they were entering the lobby of the Patio Motel. At that point, Rivera-Gonzalez and Individual B were both

placed under arrest, although Individual B was released the next day. Following the arrest, both Rivera-Gonzalez and Individual B were informed of their *Miranda* rights in Spanish. Both individuals agreed to waive those rights and speak voluntarily with investigators.

After waiving his rights, Rivera-Gonzalez admitted to investigators that he traveled from Los Angeles to Chicago on June 1, 2005 at the direction of someone else. He did not indicate who instructed him to travel to Chicago. He told investigators that he was sent to Chicago to act as a supervisor in a 50 kilogram cocaine transaction that was to take place between a purchaser in Chicago and an individual who was safeguarding the 50 kilograms. He also indicated that he would receive $500 for every kilogram that was to be sold during this transaction.

When asked about his activities on June 2, 2005, Rivera-Gonzalez acknowledged that he met with the purchaser of the cocaine, who, as described above was CW1, at the North Riverside Mall. He also stated that the purchaser was to pay $700,000 on that day. He stated that, after the meeting at the North Riverside Mall with CW1 was complete, he and Individual B took a taxi to Crystal Lake where he met with an individual by the name of "Jose," who was driving a red Chevy Blazer. During the meeting with Jose, Rivera-Gonzalez stated that Jose informed him that he only had 40 kilograms of cocaine and that Rivera-Gonzalez should check with CW1 to determine if that amount was sufficient to go forward with the transaction. Rivera-Gonzalez then stated that he and Jose agreed to talk later that day if the transaction was going to occur. Rivera-Gonzalez also admitted that, later on in the day on June 2, 2005, he had another conversation with Jose in which they both agreed that the multi-kilogram cocaine transaction would occur on June 3, 2005.

## DISCUSSION

I. <u>Pena's Motion To Suppress Evidence</u>

Defendant Pena argues that no probable cause existed to arrest him absent reference to the New York arrest warrant. Pena argues that he was never named as a subject of this investigation by the confidential source or any agents. He claims that his only connection to this investigation was meeting Rivera-Gonzalez in the parking lot of a Menard's in Crystal Lake some hours after Rivera-Gonzalez met the confidential source near a Best Buy store in North Riverside. Pena argues that there is no probable cause to justify his arrest because the New York warrant was not for him and a reasonable investigation by the agents would have revealed such. Therefore, he argues that his detention at the time he executed the consent to search was unlawful and, accordingly, the consent to search, the contraband and evidence discovered, and all statements by Pena, must be suppressed.

We deny Pena's motion to suppress because we find that the above-described facts establish probable cause to arrest Pena. The investigators, acting on information supplied by a confidential source, conducted an investigation on a claim that co-defendant Rivera-Gonzalez was planning to sell the confidential source 50 kilograms of cocaine. The agents conducted a surveillance of the confidential source and Rivera-Gonzalez at a Best Buy store in North Riverside, Illinois and then followed Rivera-Gonzalez to a Menard's store in Crystal Lake, Illinois. At the Menard's, Rivera-Gonzalez was observed meeting with defendant Pena. Investigators then followed Pena to his residence, where another resident gave them his consent to search the premises. Pena was then placed under arrest and gave his written consent to search his residence and warehouse located at 561 Jennings Drive 3.

When facts exist which are sufficient to warrant a prudent person to believe the suspects are committing a crime, probable cause to arrest is established. *Beck v. Ohio*, 379 U.S. 89 (1964); *Gerstein v. Pugh*, 420 U.S. 103 (1975). We believe that, based on the foregoing facts, probable cause existed to arrest Pena apart from the New York arrest warrant. Therefore, Pena's motion to suppress is denied.

Pena next argues that his consent to search was not given voluntarily. From the testimony presented at the hearing, and after assessing the credibility of the testifying agent, Michael Zackavec, we conclude that Pena did give knowing and voluntary consent to search both his residence and the warehouse. Agent Zackavec testified that a Police Officer who spoke Spanish asked Pena in Spanish for permission to search the house. Pena gave verbal consent to search the house. Agent Zackavec testified that Pena gave written consent to search the warehouse. While Pena argues that the written consent to search the warehouse was not voluntary because he never asked in Spanish whether he would give consent to the agents to search the property at 561 Jennings 3, there is no credible evidence in the record to support this conclusion. Two consent to search forms were presented to Pena- one in English and one in Spanish. It appears that Pena signed both forms. The forms state respectively in English and in Spanish that "I understand that I have the right to refuse to consent to this search and that I may terminate the search at any time. I am signing this Consent to Search voluntarily and without threats or promises of any kind."

Based on the foregoing, the totality of the circumstances supports the conclusion that the consent to search both the house and warehouse were given voluntarily. There is simply no credible evidence in the record to the contrary.

For the foregoing reasons, we find that the contraband and evidence that were discovered, as well as Pena's statements, are admissible. Therefore, Pena's motion to suppress is denied.

II. Rivera-Gonzalez's Motions To Quash Arrest and Suppress Evidence and Statements

Defendant Rivera-Gonzalez moves to quash his arrest and suppress his statements and property seized during the search of his motel room. For the following reasons, we deny Rivera-Gonzalez's motions.

Rivera-Gonzalez argues that his arrest should be quashed and all evidence flowing therefrom should be suppressed because his arrest was the result of an improper investigative stop by agents. He claims that the agents did not possess probable cause to arrest.

We deny Rivera-Gonzalez's motion to quash and suppress because we find that ample evidence existed to establish probable cause to arrest Rivera-Gonzalez. As detailed above, agents were conducting an investigation based on a claim by a confidential source that an individual, who turned out to be Rivera-Gonzalez, had traveled to Chicago and was planning to sell the confidential source 50 kilograms of cocaine. Surveillance revealed that the confidential source and Rivera-Gonzalez met at a Best Buy store, and Rivera-Gonzalez agreed to provide the confidential source with several kilograms of cocaine. Surveillance then followed Rivera-Gonzalez to a Menard's store in Crystal Lake where he met with co-defendant Pena. A subsequent search of a warehouse rented by Pena revealed approximately 42 kilograms of powder cocaine. After this discovery of cocaine, agents then arrested Rivera-Gonzalez.

We find that these facts were sufficient to warrant "a prudent person to believe the suspects [were] . . . committing a crime [sufficient] to establish probable cause to arrest." *See Beck v. Ohio*, 379 U.S. 89 (1964); *Gerstein v. Pugh*, 420 U.S. 103 (1975). The agents were conducting

8

surveillance with a confidential informant who had given them valuable information in the past. The individual that the confidential informant met with to discuss the cocaine transaction turned out to be Rivera-Gonzalez. Agents then followed Rivera-Gonzalez and observed him meeting with an individual (co-defendant Pena) who later gave consent to search a warehouse at which 42 kilograms of powder cocaine were discovered. Agents arrested Rivera-Gonzalez only after the discovery of the cocaine. Based on these events, there is ample evidence to support the agents' belief that Rivera-Gonzalez was committing a crime. Therefore, the motion to quash arrest and suppress the evidence seized is denied.

Rivera-Gonzalez next argues that his statements following his arrest should be suppressed because he was not given his *Miranda* rights. He claims that his statements were not made voluntarily because they were the result of physical and mental coercion by the agents. Whether Rivera-Gonzalez's consent was voluntary depends on the credibility of the testifying agent, David Zamora.

Agent Zamora, who is fluent in Spanish, testified that Mr. Rivera-Gonzalez was read his *Miranda* rights in Spanish, and that he indicated he understood his rights and was willing to talk to the investigators. There is nothing in the record to indicate that there was any physical or mental coercion or intimidation by the agents. We find the testimony of Agent Zamora to be credible.

Therefore, we deny the motions of Defendant Rivera-Gonzalez to quash arrest and suppress evidence and statements.

## CONCLUSION

For the foregoing reasons, we deny the motion of Defendant Cesar Rivera-Gonzalez to quash arrest and suppress evidence (#36), motion to suppress evidence seized illegally-search of motel

room (#37), and motion to suppress statements (#38). We also deny the motion of Defendant Jose Luis Pena to suppress evidence (#46) and his supplemental motion to suppress evidence (#54).

It is so ordered.

Wayne R. Andersen
United States District Court

Dated: January 24, 2007